In our final case, Cynthia Yelling v. St. Vincent's Health System 21-10017. I'll give the attorneys a chance to get set up. So we're going to have some time sharing today. Ms. Leslie Palmer for the appellant and then sharing time with Julie Ganz for the EEOC and then Shannon Miller for the appellee. Ms. Palmer, you may proceed and I see that you've reserved two minutes for rebuttal. Yes, Your Honor. Good morning. May it please the Court. My name is Leslie Palmer and I am excited to be here today on my first ever 11th Circuit argument representing my client, Nurse Cynthia Yelling, and these important issues before the Court. We are asking the Court today to reverse the district court's order because the discriminatory, retaliatory, and abusive acts of St. Vincent's Hospital violated Title VII. The EEOC will also be addressing the hostile work environment claim today, but I want to point out an important note. The district court's parsing apart of the evidence and minimizing Nurse Yelling's hostile work environment did not just affect the analysis of the hostile work environment claim. That parsing apart affected and tainted every aspect of the opinion negatively and affected the analysis of all the claims. This Court has repeatedly held that context matters and I cannot think of a more important situation than one like this where we have a hostile work environment claim where there is a complaint that ultimately culminates in termination. Let me ask you a question about your hostile work environment claim. In reading your brief, I honestly can't decide if you're relying on our case law or if you're telling us that our case law is out of date and we need to depart from it, which obviously we, this panel, cannot do. Can you clarify that point? Yes, Your Honor. I'm not saying that we need to depart from the case law. I'm saying we need to consider the context. Mendoza is not a bright line test of a number of incidents crystallized in time. We have to look to the circumstances, the totality of the circumstances, all of the evidence, the body of evidence as a whole and every way that a reasonable person in the world could see these acts and conduct and statements. And because of that, we can't depend on the four corners of an opinion from a quarter century ago or even ten years ago. The opinions do not stand for the premise that is the conduct in those cases that is or isn't illegal. I would argue that if those cases say that it is illegal, obviously I don't think the pendulum has swung the other way. But there is evidence. You can look at the actions of governmental entities to show that society is taking a step in the right direction and that conduct that wasn't considered by this court to be illegal 15 years ago isn't necessarily not illegal today. Let me drill down on one of the cases that you're relying on in the hostile work environment case. Let me ask you a question about that. In Fernandez, we concluded that the plaintiff met his burden on the pervasive factor when he specified the comments occurred nearly every day. And we specifically said this was different from vague terms such as constantly. Is there enough evidence in this case to satisfy the severe and pervasive prong when Ms. She heard some of the insensitive comments only saying they happened often? There is, Your Honor. And the reason for that, again, is the totality of the circumstances and the context. In some instances, she said often. In some instances, she said it wasn't unusual. In some instances, she said every weekend. And you have to look at the entire body of evidence. You cannot put the ingredients to a cake on the counter and call it a cake. You cannot look at the butter and say that's a cake or the egg and say that's a cake. You have to look at it as a whole. You have to put it all together. And that's what we have to do here. But you're saying that her testimony is different than just saying constantly, which we said was too vague. Exactly, Your Honor. She provided some concrete incidents and some context. And when asked if there was more than that, she said yes. She said those were the ones that she made the note of, but there was more than that. What are we to do with the fact, and I'm going to ask the EEOC this, too, because I'm really, this is something I've been struggling with for a while. I mean, the First Amendment gives people the right to say negative things about the President and the First Lady, right? I think it gives them the right to say racist things about the President and the First Lady. I don't think Congress could pass a law that, you know, said that employers have to pay money if their employees criticize the President in harsh terms, right? Given that, what do we do with the fact that so many of these comments were racist about the President and the First Lady? Again, Your Honor, I'm going to bring you back to we have to look at the context. We have to look at the context. The context is, this was not, it's 2015, so President Obama is the President. Exactly. And the statements that were being made about the Obamas in this incident are, using this court's words, immutable characteristics. They're characteristics that— Yeah, they're absolutely racist, no question. I mean, I would be very offended if people said this about President Obama to me in my presence. But they're about the President. They're not about a nurse. They're not about a coworker. They're not about, I mean, they're about the President and the First Lady. And I guess that's what I'm struggling with is it seems very problematic to me for a federal court to tell an employer, you have to pay money because your employee was criticizing the President of the United States in very harsh terms. It's important to understand, Your Honor, that it wasn't harsh terms. It was personal traits and characteristics that nurse yelling shares with the Obamas. And this court held in Jones v. UPS that those comments are enough. Those comments in that case were about the Obamas. That's exactly what happened here, and this court has precedent to rely on. I have a question about your Quig argument. You see, you are arguing in the alternative that there was a single reason and then that there's a mixed motive also. Those are alternative arguments? No, Your Honor. My argument is that there is not a single reason. Okay, so you're exclusively going on mixed motive? It's— Because you were arguing McDonnell-Douglas in the district court, weren't you? I was not, Your Honor. So the defendant argued McDonnell-Douglas. I responded and then relied heavily on convincing Mosaic and the other frameworks that this court, the statute, and the United States Supreme Court— Okay, so it's exclusively—on the discrimination, it's exclusively a mixed motive claim? Yes, Your Honor. What is the motive other than race? Arguably, a jury could draw an inference that the motive presented by the defendant, by the appellees in this case, was a motive. And because of that, we concede that there could be a mixed motive. Additionally, we have race and retaliation. So we ourselves say it's two things. It's three things. It's race, retaliation, and the hostile work environment. Everything has to be taken in context. So you are conceding that one of the motives in this case can be that the employer believed she was falsifying records? That is one way that a jury could look at it, Your Honor. That is only one way. That is not the only way. And that's not a decision for this court or, frankly, the district court to make. In Quigg, though, there was a situation where that motive was admitted to. Like, yes, I was fired for, in this case, falsifying records, but this is what also happened. But your client is in no way admitting that that is inaccurate, that that is, in fact, a legitimate motive. Exactly, Your Honor. I'm out of time, but may I ask you a question? So our position in that instance would be that the courts are conflating a mixed motive affirmative defense with a mixed motive pleading or a mixed motive analytical framework. So you're saying you can proceed under Quigg even if your client would deny the other motives? Correct, Your Honor, and that is clear in the plain text of Title VII. Thank you. Ms. Ganz.  Thank you, Your Honor. And may it please the Court, I wanted to just start in order of the questions raised. The Eleventh Circuit case law actually supports reversal of summary judgment in this case. I want to particularly cite Reeves, this Court's en banc decision that held that you can have a hostile work environment. In that case, it was a sexually hostile work environment by overhearing comments denigrating your protected group. They don't have to be directed personally towards you. This Court's decision in Fernandez also said the same thing involving a Cuban plaintiff. And this Court's decisions in Smelter and in Jones v. UPS Ground also compel reversal of summary judgment in this case, in my opinion. You've also argued that the District Court erred in failing to consider comments made before the 180-day cutoff period. Oh, yes, Your Honor. Wait, I'm not done with my question. You've claimed that racial insults were happening regularly and repeatedly throughout 2015. But let me pin you down on this. Aside from Will Hite's comment that occurred in March of that year, what other specific comments were made outside of the 180-day period? Okay, I actually made a list of the testimony that would go to frequency. So when asked, so the comment about students, was Obama handing out food stamps, was one of several comments, according to Yelling. She said that, quote, Linda and Sandy and Tiffany would always make racially insensitive comments. That was not unusual for them. She said things like when there were blacks portrayed in the media, every time she would come up to the nurses' station, someone would be making a comment. And she mentioned that at the time of the food stamps comment, it had become heated in terms of it had escalated, the number and type of comments. And I wanted to address the comment about the Obamas. So while, it's been a while since I've taken First Amendment law, but I don't believe that would be implicated in a private workplace. But the comments about the Obamas. Yeah, because the way you're asking us to read this statute is that it imposes liability on the employer for the speech, the political speech of its employee. And so the only way the employer could avoid that liability would be to silence its employee's political speech. So that's why the First Amendment comes into play, is that you're basically fining the employer for its employee's political speech. I'm not, you know, and I'm not saying this is a, I just, it seems to me that in light of the First Amendment fact that we can all criticize the President, we have to consider criticisms of the President a little differently than we would consider, you know, criticisms of some private person. Again, we didn't actually take a position on political speech, but the comments about Michelle Obama resembling a monkey or is a monkey and Obama should go back to Africa were part of a whole, I think of it as like a toxic cloud, a hostile work environment, where you look at the totality of the circumstances. And black patients were called ghetto fabulous, crackheads, welfare recipients, that kind of thing. See, that's the thing, and I'm not, this may not necessarily resolve the case at the end of the day, but I mean, the most racist stuff that these people said were about the Obamas. I mean, the monkey comment and the go back to Africa, like that's super racist. Agreed. The other stuff, you know, I don't know, right? I mean, I looked up ghetto fabulous because I don't know what it means. And I don't know, it doesn't seem to be racist. It seems to be like a fashion term. This court in Smelter recognized that suggesting that blacks were welfare recipients or drug addicts was because of race. And, again, if there's any ambiguity, that would have to go to a jury to determine, in the same way that the comments about flying a Confederate flag were also improperly expressed. The interesting thing is you talk about the context. You know, when this occurred, the state of Alabama's capital, there was a Confederate flag that flew over the state of Alabama's capital. So, again, the context, I'm not sure that that, and this is something I'm struggling with, but I mean, you know, if someone had said, I live in a state that flies the Confederate flag over the capital, that would have been a true statement, and it's hard to read that as creating a hostile work environment, given that that's just what was happening in 2015. If this court's case in Jones versus UPS, the court held that that could be part of a hostile work environment, that people were wearing it. They were wearing it, right, yeah. They weren't just talking about it, I guess is my point. But that's, there isn't really a measurable difference between voicing support for the flag and wearing a T-shirt with it. Well, isn't there, though? I mean, the T-shirt is kind of putting it in someone's face, voicing support. I mean, like I said, in 2015, a big issue in Alabama was whether to have the Confederate flag be in the capital or not. Yes, and this is something that's going on all over the South, I would say. So, the fact that Yelling testified that she heard it as a racially offensive comment supporting, because of what it stands for, white supremacy, slavery, it doesn't mean that everyone meant it that way or heard it that way, but it's enough. And according to this court's case in Scott that called it a racial symbol, that a jury would have to sort out whether it was because of race. So, the court excising it from the case. Let's just give it to you. I mean, I'll just give it to you that certainly someone could be offended, could take that sort of racially offensive that people were talking about the Confederate flag. I guess my issue is the standard is severe and pervasive. Correct. And so, you know, you've got people saying negative things about the President that are super racist, negative things about the First Lady that are super racist, and they're talking about Confederate flags. Where do you get to severe and pervasive? You know, let's just say that's racist stuff, but where do you get to severe and pervasive, I guess, is the issue. It goes to how often those comments were made, the severity of those comments. Yes, severity of the comments, I guess that's my, like, severity of the comments seems different if you're talking about, it seems like we'd have to say that's different if you're talking about the President or some other public figure that you have a First Amendment right to criticize or a controversial issue going on at the time, which is flying the Confederate flag, versus something else, you know, maybe calling the patients welfare queens. I think that's kind of a different issue. Should we, in our questioning the severity of this, how do we weigh, do we weigh comments like that? Yes, you do. You look at the totality of the circumstances. You look at a reasonable person in the plaintiff's position, and she was the only black nurse on her shift. She was hearing comments about her protected racial group, people being compared to monkeys, which courts have compared to the N-word. She's hearing black indigent patients who she's caring for being called crackheads, where white patients that had addiction issues were not. She is hearing her colleagues basically brag about flying the Confederate flag, which to her meant they were supporting white supremacy and slavery. That's how she heard it. So, again, this all goes to a jury. We're on summary judgment. So you have to give her all reasonable inferences, evaluate the facts in the light most reasonable to her. Again, taking into account all the circumstances, all the comments she heard over this basically year she worked there. So the comments became heated in March, but she certainly testified that they had been going on before that. She also complained repeatedly. Let me loop back to what I had asked before. Yes. As you're saying, we've got to go back outside this 180-day period, but Ms. Yelling's EEOC charge specifies that no discriminatory conduct occurred before June 21 of 2015. How do we— Her charge says that? Yeah, that she filed on November 23rd of 2015. Well, that's not consistent at all with her deposition testimony. She talked about those comments by the supervisor being several, but the one that stuck out was the one about the food stamps. She mentioned that her colleagues had always made these racially offensive comments about black patients, and she mentioned it had been going on throughout 2015. And the court, the district court, read that testimony as being repeated and ongoing. So it's— Let's assume I'm correct on citing this date in the EEOC charge so we make—that just doesn't matter? I don't think that would affect anything, given that the case developed after that. All right. And you have now—you've answered my question, and you've exceeded your time. Oh, sorry. Thank you very much. Ms. Miller. Thank you, Your Honors. And may it please the Court, I am Shannon Miller here on behalf of the Appali St. Vincent's Health Systems. And I would like to start by addressing the great points that were brought up by both Judge Brasher and you, Judge Branch, that the very essence of the hostile work environment claim in this case was properly decided at the district court below. And the district court did, in fact, take into account the context of the situation. But when we're talking about the totality of the circumstances, we also have to address the fact that Ms. Yelling, in some of the instances, was herself an instigator in the discussions that she is claiming had racist overtones with the comments by her coworkers. The other thing that must be made clear is that none of the alleged racist comments were ever directed at her herself. Nobody said any type of racial slur to Ms. Yelling. And we would argue that nobody said any racial slur at all. It is our position that the term monkey in and of itself is not the same and not as severe as the term the N-word, which is absolutely offensive. And Judge Brasher and Judge Branch, you're right. Some of these comments, the alleged comments, were absolutely offensive. We're not saying that they're not. But there has to be – They're more than offensive. They're racist. Absolutely, Your Honor. Absolutely. No one's trying to argue that comments about the Obamas were anything but racist. There were other comments that she pointed to, that Ms. Yelling pointed to, that the district court considered not related to race. One of those being – or some of those being the comments about being rednecks. Some of the food stamp comments were more, in our submission, a socioeconomic comment as opposed to a truly racist comment. Let me ask you something that has been bothering me. In your brief, you argue that St. Vincent's investigated and moved to remedy the situation when Yelling reported the racially insensitive comments being used around her. But I didn't see anything that showed me where that is, in fact, true. What evidence supports that claim? You have DuBose admitting that she couldn't remember what investigation, if any, she did into these concerns. Yes, Your Honor. There were times that you're correct, that the record does not reflect an investigation. However, part of the issues that makes it confusing on the record is that the investigations that St. Vincent's was undergoing during Ms. Yelling's employment were intertwined with complaints raised about Ms. Yelling herself. So, for example, there was a black patient care tech who made a complaint that Ms. Yelling was dismissive, bullying, or some other complaint along those lines. And as part of that investigation, Ms. Yelling responded with the allegations about her coworkers. You said these investigations are intertwined. All I see is one investigation really going on of the complaints against Ms. Yelling. I just don't see anything in the record to show that there was another investigation dealing with her complaints. Those two things can be true at the same time. So if you say intertwined, it suggests two investigations, but I only see evidence of one. No, Your Honor. And my apologies if that was — what I meant by intertwined was the fact that she had made — that there had been a complaint about her that prompted it. I'm not trying to argue that there were two different investigations to that. But there were investigations such as when Ms. Yelling cursed her coworkers and their grandchildren, that investigation. There were separate investigations throughout the course of her employment. There was certainly the investigation into the falsification of the records that led to her termination. However, with respect to the hostile work environment, this Court need not reach the second step of whether there was a — and whether or not St. Vincent's remitted it because it doesn't meet that stringent standard of the severe pervasiveness that's required of hostile work environments. That's particularly true with the distinction between, for example, the Jones case that my colleagues have brought up. In Jones, the coworkers wore T-shirts displaying the Catholic flag. They had crowbars in their hands while they were making racist statements to the plaintiff about the plaintiff. That is a clear distinction in the fact scenario that we have. What if — so I pushed on the Confederate flag stuff a little bit with the lawyers on the other side. But, I mean, what if these people had said in the presence of an African-American colleague, hey, you know, we support the Klan, right? They're not wearing a hood, right? They're not wearing Klan stuff to work. But they're saying, we support the Klan, we love the Klan, and we like what they do. Wouldn't that be — wouldn't that be a serious problem? I mean, wouldn't that rise to the level of severe and pervasive if someone said that in the presence of an African-American colleague? Your Honor, absolutely would be offensive. There's no doubt about that. No one is trying to argue that any comment related to the Klan would not be anything but racist. Yeah, yeah. Well, I guess — so I think their point is the Confederate flag is the same thing. Is that saying that, you know, I support the Confederacy and what it stood for is the same thing. So why isn't saying I support that equivalent to wearing a T-shirt that has it on it? You know what I mean? So, Your Honor, as everybody has said today, context matters. And it would depend on the context of the situation where somebody was saying the Klan. But I do not think that the evidence in the record in this particular case where Ms. Yelling said that the only place that any of the alleged racist comments occurred were at the nurses' station, where she was not frequently sitting because she was caring for patients, could rise to the level of the severe or pervasiveness that is required. But obviously she was hearing. I mean, I know you've made that point that she wasn't at the nurses' station, but she's clearly passing by it and hearing these comments. So I guess I'm not following that part of the argument. Sure. Absolutely, Your Honor. And if I may, she was — it wasn't — it goes to the pervasiveness and the constancy that you were concerned about earlier in this argument, that the — that if she is not there frequently, that goes to one of the levels of trying to determine whether or not this rises to the level of an actionable hostile work environment. And the district court below didn't disagree that she was offended by it, but it didn't reach that level. And there has to be some level, some guidepost, which this Court has held throughout, that, you know, it can't be everything. You know, we have to put up with a level of boorishness at the workplace because otherwise the floodgates would open up. Everybody would be offended about everything all the time. And that this is under the guidepost of the totality of the circumstances that the district court properly held below did not reach the severe or pervasive standard that's required. And again, the Jones case being the one that was cited, again, the individuals in that case were — had a crowbar out with the Confederate flags. They threw banana peels at the individual. That's certainly different than the diatribes of coworkers about politicians that they dislike. Again, not saying that the comments about the Obamas weren't racist. They just simply, in this instance, did not reach that level that would be an actionable workplace. What about the statements about the patients? I mean, I'll just say, you know, I think — you know, I'm having difficulty figuring out how to assess all these comments. But to me, the political stuff is kind of in a separate category. But the comments about patients seems very different in the degree to which it would create a hostile work environment. What do you say about that? So, Your Honor, the comments about the patients, one of which was ghetto fabulous, which to your point, Your Honor, I was not familiar with that term. I can see how that could be a socioeconomic term as much as it could be a racist term. The welfare queens the same way, right? That, I mean, the idea of the food stamp comment could be as much a socioeconomic statement as it could be a racist statement. But no matter what the comments were and whether we assume all of the comments were racist, they simply did not reach that high standard that is required for the severe or pervasiveness to substantiate such a claim. The other thing is that as part of that, it has to determine whether or not it interferes with her ability to conduct her job. And there's no evidence that she wasn't able to care for patients because of these comments. There's no evidence that that took place. And she testified that she pushed back and made positive comments about the Obamas when and if she heard those comments. I have a question about the retaliation and specifically the drug testing. I know you say it's not an adverse action, at least for purposes of the discrimination claim. But if she gets a drug test and then is out of work for a couple of days, why does that not at least meet the lesser standard for retaliation? Yes, Your Honor. So for the drug test, if you were uncomfortable in ruling that or affirming that this did not reach an adverse employment action, she does not have any evidence that her complaints of — No, I understand that. You've got other arguments. But I just wondered if you could address that, you know, something that would make a reasonable person less likely or dissuade somebody from making a complaint. Here, someone gets a drug test right afterwards and then misses a bunch of work from it. Wouldn't that meet that standard? Your Honor, I could absolutely consider a case where such a drug test could and would be an adverse employment action. In this particular instance, the drug test was after a complaint that a black patient care tech made about Ms. Yelling herself and was on the heels of the house supervisor finding Ms. Yelling's prescription bottle in a patient's room. So given that context and the fact that she missed two shifts and was paid for those, we do not believe it reaches that level of the adverse employment action, whether under the race discrimination claim or the retaliation claim. But again, if this Court's uncomfortable and finds that that was an adverse employment action, there's no evidence that it was her complaints of discrimination that were the but-for reason for that. Let me ask one question. You heard my question about Quigg. Can someone, can a plaintiff bring in the alternative, a single motive claim and a mixed motive claim? It seems like they usually elect. I don't know if there's a reason for that, but it's a little peculiar here to have both. Yes, Your Honor, and our position is that it's either or. A case law that supports that? I will submit that from my reading of the case law, it's somewhat unclear. But in this particular instance, it doesn't matter which of those burden shifting or analyses this Court chooses to use. The district court was very focused on the traditional McDonnell-Douglas, where she was not able to, where Ms. Yelling was not able to substantiate any comparators. Some of the adverse actions were outside of the 180-day period, and there was no evidence of pretext. But with the mixed motive claim, there has to be some evidence of race as a motivating factor, and just an allegation that race may have been a motivating factor is not enough. There has to be some actual evidence of that, and I'm not aware of any evidence that the decision-makers didn't use racist terms. There was no — there's no pointing to the decision-makers in this case having a racial motive for any of the adverse employment actions that were taken against her, which — But if this Court, looking just at the mixed motive claim, if this Court determined that you're right, there's not evidence that would support there was any motive based on race, to do that obviously without McDonnell-Douglas, and then there wouldn't be any need, if that were the case, to separately address the alternative single motive claim, would there be? I mean, that would just be the end of that in terms of the discrimination. Yes, Your Honor. That would be accurate. And in Quigg, to your point, Judge Branch, that absolutely was the case there that they admitted. The decision-makers in that case admitted that gender, I believe, was the protected class in that case, was a reason for the decisions that were at issue. That is wildly different than what we have here, where no one has admitted that race was a motivating factor. Well, there wouldn't have to be an admission to bring that. I'm just not sure you can kind of do both, but maybe you can. And, Your Honor, we would — I mean, we raised those arguments to make sure that we covered whatever this Court would want to analyze the claims under with that. And we submit that whether it is the traditional McDonnell-Douglas burden-shifting, whether it's a mixed motive analysis, whether it's a convincing mosaic analysis, it matters not. The result is the same, that the district court properly dismissed both the race and retaliation claims under that. And so for that reason, we respectfully request that this Court affirm the decision below. Thank you.  Ms. Palmer, you have two minutes for rebuttal. Your Honors, if I could briefly address Judge Windsor's question again about the mixed motive. It's important to understand that mixed motive is not a pleading standard. A plaintiff cannot be forced into pleading their individual claims under a particular motive. It's an evidentiary framework. It's something that can develop. It's a theory of the case that can change along the way. There is no precedent that I'm aware of that requires a plaintiff to plead mixed motive or single motive. And to do so would violate Rule 8 of the Rules of Civil Procedure. I agree it's not a pleading issue, but why wouldn't then every single motive plaintiff say, and if you disagree with me or if I lose on McDonnell-Douglas, at the very least it was a motivating factor, and I'm not going to say what the other factor was or I'm not going to concede that there was another valid factor. Why wouldn't that be present in every case? It could be, Your Honor. Okay. I'm not saying it is, but if you look to the text of Title VII. Maybe you just have to have better lawyers that are going to make those arguments. Maybe that's the idea. So if we look to the text of Title VII, we have to prove the because of, which is the but for that Bostock talks about. And then Bostock goes on to recognize that Title VII also says motivating factor. And Bostock, by the United States Supreme Court, recognizes that, at least as they understand it, motivating factor may, in fact, be less than the but for causation required under the, you know, choosing, finding one reason or finding a reason that makes a difference. And I want to make that clear. It is a reason. It's not the reason. And that's the problem that we have with these cases is we're being held to a higher standard than what even the jury charges represent. What do you mean these cases? Employment discrimination and retaliation cases, Your Honor. So the jury charges just say we have to show motivating factor. At summary judgment, we're being held to some quasi but for cause standard, and that's inappropriate. Additionally, I just want to point out to Judge Brasher, the standard is severe or pervasive. We don't have to prove both. And I see I'm out of time. Can I wrap up? Can I ask just a question? So just what's your best, I mean, just your best argument, your argument that you're this was a hostile work environment, that it meets this high standard, and that it was so severe or pervasive that it changed, you know, the status of her employment? What's your best argument there? The elevator pitch, Your Honor, is that you have to consider every piece of evidence in totality. That includes statements. That includes acts. And you have to do so from a reasonable person's perspective. In Nurse Yelling's condition, I'm sorry, in Nurse Yelling's position, with her life experiences and her social context. Respectfully, Your Honor, that's not you. That's not me. That's Nurse Yelling. Thank you. Thank you. We have your case under advisement, and court is adjourned.